FREEDOM COURT REPORTING

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

MONICA PERRYMAN,

    Plaintiff,

vs.        CIVIL ACTION NO. 2:06-cv-mef

FIRST UNITED METHODIST CHURCH; and DARLENE MAYE,

    Defendants.

\*   \*   \*   \*   \*   \*

DEPOSITION OF DARLENE MAYE, taken pursuant to notice and stipulation on behalf of the Plaintiff, at Rushton, Stakely, Johnston & Garrett, Montgomery, Alabama, before Bridgette Mitchell, Shorthand Reporter and Notary Public in and for the State of Alabama at Large, on October 10, 2006, commencing at 1:10 p.m.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Exhibit B

FREEDOM COURT REPORTING

Page 5

1        COURT REPORTER: Usual
2   stipulations?
3        MR. GARRETT: That's fine.
4        MR. HURST: Is he staying in as
5   a representative?
6        MR. GARRETT: Yes.
7        DARLENE MAYE, having first been
8   duly sworn or affirmed to speak the
9   truth, the whole truth, and nothing but
10  the truth, testified as follows:
11                  EXAMINATION
12  BY MR. HURST:
13  Q. Okay. Could you please state your full
14     name?
15  A. Darlene Maye.
16  Q. Okay, Ms. Maye. Where were you born,
17     Ms. Maye?
18  A. California.
19  Q. California. I don't want you to take
20     offense to this question. Are both of
21     your parents African-American?
22  A. Yes.
23  Q. Where did you see -- where did you

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Exhibit B

FREEDOM COURT REPORTING

Page 12

1  A. Christopher and Nicholas Maye.
2  Q. Where were you employed when you moved
3     to -- you moved directly from
4     California to Alabama?
5  A. Yes, I did.
6  Q. Where were you employed?
7  A. I worked at Huntingdon College Child
8     Care Center and I worked for Montgomery
9     schools briefly as a substitute when I
10    first got here.
11 Q. How long were you employed with
12    Huntingdon Child Care Center?
13 A. About three years.
14 Q. What position did you hold there?
15 A. I started as a pre-K teacher and ended
16    as the acting director.
17 Q. How long were you acting director?
18 A. About -- less than a year.  They
19    closed.
20 Q. And when was that?
21 A. 2000.
22 Q. Why were you -- where were you employed
23    next?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Exhibit B

FREEDOM COURT REPORTING

Page 13

1  A. First United Methodist Church.
2  Q. How did you find out about the
3     position?
4  A. Parents from Huntingdon College.
5  Q. A parent?
6  A. Parents from Huntingdon College.
7  Q. What was the qualifications for the
8     position?
9  A. Supervisory experience, bachelor's
10    degree.
11 Q. Okay. What's your rate of pay?
12 A. To start?
13 Q. Yes.
14 A. Twenty-five thousand.
15 Q. As a supervisor, you were employed,
16    obviously. That's the position you
17    hold now is supervisor?
18 A. Director, yes.
19 Q. You're director now?
20 A. I was hired as the director.
21 Q. You were hired as the director?
22 A. Yes.
23 Q. Do you have an immediate supervisor

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Exhibit B

FREEDOM COURT REPORTING

Page 20

1  A. There are parts in the ECDC policy that
2     say the director's discretion can be
3     used.
4  Q. And which parts of that policy?
5  A. For example, request for time off.
6  Q. Time off.  That's discretionary?
7  A. Yes.
8  Q. I thought there was a two-week
9     notification?
10 A. But a director's discretion can be
11    used.
12 Q. So the director can overrule the
13    two-week notification?
14 A. Correct.
15 Q. What else is discretionary?
16 A. That's all I can think of right now.
17 Q. Okay.  That's all?  All right.  What
18    about procedure?
19 A. What about it?
20 Q. Is any part of that discretionary?
21 A. Not that I can think of right now.
22 Q. Okay.  Does the policy and procedure
23    say anything about religious

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Exhibit B

Page 21

1  instruction?
2  A. It does.
3  Q. What does it say about that?
4  A. Something to the effect that we are a
5     religious-based organization and prayer
6     will be implemented. I don't know the
7     exact words, but it alludes to that.
8  Q. Is there a guideline for the prayer or
9     procedure or policy?
10 A. In individual classrooms there are.
11 Q. Okay. What are those?
12 A. That we have prayer before every meal.
13    That they are read religious stories.
14    That they attend chapel every
15    Wednesday. Those are just a few.
16 Q. Well, I'm going to have to have more
17    specific ones. Just what, prayer,
18    religious stories, and chapel? Do you
19    provide the books?
20 A. We do.
21 Q. What are the books? Where do you get
22    them from? What are the titles, first?
23 A. Well, the resource library is full of

FREEDOM COURT REPORTING

Page 28

1   understood you learn primary colors,
2   your shapes, you say the blessing.
3   Those things are understood. That's
4   not in a lesson plan.
5   Q. I'm talking particular about the Ten
6   Commandments.
7   A. If you were to subpoena what, the
8   lesson plan? It wouldn't be on there,
9   because it's understood that it's
10  taught. It's all around the classroom.
11  Q. Well, how is it understood that it's to
12  be taught just because it's around the
13  classroom?
14  A. Because I instruct the teachers to have
15  a ritual that they do every day, and
16  that's part of it.
17  Q. So you instruct all the teachers prior
18  to being hired that they have to teach
19  the Ten Commandments?
20  A. Uh-huh. In the lower classes, they
21  learn one through three, and then one
22  through five. And by the time they get
23  to pre-K, they learn one through ten.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Exhibit B

FREEDOM COURT REPORTING

Page 29

1  Q. Okay.
2  A. And that is -- and you can subpoena
3     anything and it will say that.
4  Q. Okay.  But all the teachers have to
5     teach the Ten Commandments?
6  A. Yes.
7  Q. Okay.  Now, let's get to -- what other
8     religious activities do they do that
9     points to a particular doctrine or
10    teaching other than what you've talked
11    about -- the Ten Commandments, the
12    Lord's Prayer, and a generalization of
13    God?  What else do they --
14 A. Well, they go to the sanctuary.  Every
15    Wednesday they go to chapel.
16 Q. Every Wednesday?
17 A. Yes.
18 Q. The sanctuary?
19 A. The children's chapel.
20 Q. Okay.  What's in the children's chapel?
21 A. It's a sanctuary, a mini sanctuary
22    for --
23 Q. Well, what's in it?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Exhibit B

```
 1      any prayer.  Give me an example of a
 2      prayer you heard.
 3   A. A prayer they're given to teach?
 4   Q. If they were given a prayer, then the
 5      teacher wouldn't be allowed to say --
 6   A. They're given several prayers and they
 7      can choose which one they want to
 8      teach.  So, yes, they're given a choice
 9      of prayers, but they can choose which
10      ones they want to teach.  An example
11      would be the morning blessing that they
12      have before meals.
13   Q. What's the morning blessing?  What does
14      that say?  Can you recite it for me?
15   A. There are several of them.  God is
16      great, God is good, let us thank Him
17      for our food.
18   Q. How is the center funded?
19   A. Primarily through tuition, I suppose.
20   Q. And where does the other support come
21      from?
22   A. The church.
23   Q. And that's the only two support
```

Page 37

1  mechanisms?
2  A. Yes.
3  Q. Funding and tuition?
4  A. Yes.
5  Q. How much -- what are parents instructed
6     their tuition covers?
7  A. Day-to-day care of their child, two
8     snacks, and a hot meal.
9  Q. So why does the church need to
10    contribute money?
11 A. Initially for the setup, I suppose, the
12    church contributed money. I'm not
13    sure. I don't know.
14 Q. But right now it's supported strictly
15    by tuition?
16 A. As far as I know.
17 Q. The teachers, are they chosen because
18    of their religious affiliation?
19 A. No.
20 Q. Is religion even considered in the
21    application process?
22 A. No.
23 Q. Do they have to be spiritual?

Page 40

1    nine-fifty.
2  A. Correct.
3  Q. Are pre-K teachers paid more?
4  A. No, not necessarily.
5  Q. Okay. Not necessarily. Where in your
6     guidelines and procedure is pay -- is
7     pay discretionary?
8  A. Each teacher is equal and they're hired
9     based on their background and
10    experience and education. It doesn't
11    matter which classroom you're in that
12    you get more or less money.
13 Q. But I'm asking you, is there a
14    guideline for the pay scale?
15 A. There's a guideline, yes.
16 Q. There's a guideline?
17 A. Yes.
18 Q. So college -- so on that guideline,
19    because Heather has a bachelor's
20    degree, what does the guideline say
21    about pay for people who have college?
22 A. They start out at eight dollars an
23    hour. There's a range between eight

**FREEDOM COURT REPORTING**

Page 55

1  Q. Why did you choose to terminate her?
2  A. I didn't terminate her for that. I
3     terminated her for lack of following
4     procedures when she didn't sign a memo
5     I circulated.
6  Q. Okay. We'll get to that. So that was
7     a different reason why you --
8  A. You asked me why I terminated her, and
9     that's why.
10 Q. Okay. But you suspended her for the
11    no-show days?
12 A. Correct.
13         MR. GARRETT: Let's take a
14    quick break, if you don't mind.
15         (Short recess.)
16 Q. Okay. We were talking about this
17    suspension that happened around the
18    14th or 15th of February 2005. And
19    Ms. Perryman asked for the day off to
20    go to the WIC program, and you said she
21    could have a half a day?
22 A. Correct.
23 Q. Did it normally take -- you said from

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 65

1    with her termination?
2  A. Yes.
3  Q. All right. You cite these as reasons
4     for her termination. Your refusal to
5     acknowledge and accept ongoing ECDC
6     policies and procedures as set forth in
7     the communication memo dated March 1,
8     2005, is the final infraction leading
9     to your termination. What is that
10    about?
11 A. That meant that she had been suspended
12    and she was a no-show, and so this is a
13    third infraction when I asked her to
14    sign a memo that I circulated regarding
15    calling parents at home. She was the
16    only one who refused to sign it.
17 Q. Could it be that something was attached
18    to her memo that wasn't attached to
19    other people's memo?
20 A. No.
21 Q. Was her memo the same as everybody
22    else's?
23 A. It was a memo directed to the entire

1  staff that had --
2  Q. So it's your testimony that her memo
3     had nothing different on it than
4     anybody else's memo?
5  A. She didn't have a particular memo. It
6     was one memo circulated to the entire
7     staff.
8  Q. Now, why did she have to sign the memo?
9  A. It's a way that I communicate to my
10     staff. I have fifteen to nineteen
11     employees. I can't walk up to each of
12     them individually, so I send around a
13     memo. Each of them will sign it saying
14     that they not necessarily agree with
15     but at least that they have read it. I
16     called her in the office and asked her,
17     Monica, did you read the memo? Yes, I
18     did. But she refused to sign it.
19          MR. GARRETT: Let him ask the
20     question. It will go easier that way.
21  Q. Okay. She refused to the memo. Why
22     did she refuse to sign it?
23  A. You would have to ask her that.

FREEDOM COURT REPORTING

Page 67

1  Q. You didn't ask her?
2  A. Yes, I did.
3  Q. Did you tell her if she didn't sign the
4     memo she would be terminated?
5  A. I told her there would be consequences
6     if she didn't follow the policy and
7     procedure.
8  Q. And that's in your policy and procedure
9     that you have to sign memos?
10 A. That you have to comply, yes.
11 Q. But not sign.  Did anybody else not
12    sign the memo?
13 A. Everyone signed it.
14 Q. Okay.  But Ms. Perryman.  Your lack of
15    DHR-required training hours combined
16    with a blatant insubordination in an
17    open ECDC staff meeting on February 8,
18    2005.
19        Was she counseled about this open
20    and blatant insubordination?  What was
21    that about?  And then we'll get to the
22    DHR-required training.  Was she
23    counseled about that?  You said blatant