# FREEDOM COURT REPORTING

Page 135

1    time off February of '04, which you

2    spoke about, June of an unknown year,

3    and then February of '04 again after

4    your son's automobile accident;

5    correct?

6  A. Correct.

7  Q. And you were denied time off at that

8    time?

9  A. Yes, sir.

10 Q. Were you ever told why you were denied

11    time off for your son's accident?

12 A. Ms. D wasn't present and the

13    supervisor -- the person who was over

14    her when the accident happened while I

15    was at work, I went to that person and

16    I asked her could I leave.

17 Q. Who's that person, first of all?

18 A. Ms. Renee Snare.

19 Q. Renee Snare?

20 A. I think that's how she says her last

21    name.

22 Q. Snare?

23 A. Snare.

Exhibit A

# FREEDOM COURT REPORTING

Page 136

1  Q. And what did Ms. Snare say to you?

2  A. She said I may leave.

3  Q. Okay.

4  A. But when I called Ms. D to let her

5     know, she told me I did not ask her for

6     time or to leave.

7  Q. And that's true; right?

8  A. Right.  But I asked the person over

9     here, because she was not present.

10 Q. Okay.  That's fine.  What's

11    discriminatory -- where's your

12    discrimination?

13 A. She told me I had to come back to work.

14 Q. Okay.  Where is the discrimination?

15    How were you discriminated against?

16 A. Because there was people in other

17    situations that left and didn't . . .

18 Q. Okay.  Let me ask it this way.  When

19    Ms. Maye called you on the phone and

20    told --

21 A. I called her.

22 Q. Okay.  You called her?

23 A. Yes.

Exhibit A

## FREEDOM COURT REPORTING

Page 137

1    Q. And she told -- what did she tell you?

2              (No immediate response given.)

3    Q. When you called her, what did she tell

4       you?

5    A. That I didn't have permission to leave.

6    Q. Okay.  And what did you say?

7    A. That I had went to Ms. Renee, because

8       she wasn't present.

9    Q. Okay.  And what did she say to that?

10   A. That I had to come back to work.

11   Q. Okay.  What did you say?

12   A. That my son was in the hospital.

13   Q. Okay.  What did you say after that?

14   A. What do you mean what did I say?  I

15      told her my son was in the hospital and

16      I was unable to come.

17   Q. What did she say then?

18   A. I don't remember.

19   Q. Okay.  I mean, were you somehow hurt by

20      this, injured by this?

21   A. No.  What do you mean was I hurt?

22   Q. Well, I mean, I understand you all had

23      this conversation.  What is the -- did

Exhibit A

## FREEDOM COURT REPORTING

Page 138

1    anything happen to you for missing that

2    time because of your son?

3    A. What do you mean did anything happen to

4    me?

5    Q. Well, I mean, did anything happen?  You

6    took this time off because your son was

7    in an accident.  I mean, were there any

8    repercussions for you doing that?  Did

9    you suffer anything?

10   A. No, sir.

11   Q. Okay.  Besides the -- are there any

12   other times where you requested time

13   off that you didn't receive besides

14   what we've talked about, besides

15   February '04 and the accident in

16   February of '04?  Tell me about this

17   June, this unknown June, request.  Tell

18   me about that.

19   A. Tell you what it was for?

20   Q. Yeah.

21   A. To take my daughter Timesha -- I have

22   an annual thing I have to do for human

23   resources.

Exhibit A

## FREEDOM COURT REPORTING

Page 139

1    Q. An annual thing you have to do for

2       human resources?

3    A. Right.  Because Timesha is not legally

4       my child.  She's, like, a guardian.

5       I'm her guardian, so I have to report

6       to human resources every June.

7    Q. Okay.  And you requested time off to do

8       that; is that correct?

9    A. Yes, sir.

10   Q. And you were denied time off for that?

11   A. Yes, sir.

12   Q. Were you told why you were denied time

13      off?

14   A. I -- I don't remember.

15   Q. You don't recall why you were denied

16      time off?

17   A. No, sir.  She just . . .

18   Q. I mean, is that a no?

19   A. Yes, sir.

20   Q. And you feel like you did not receive

21      time off in June of an unknown year and

22      twice in February because of your

23      gender, because you're female?

Exhibit A

## FREEDOM COURT REPORTING

1  A. And there was other -- there was

2     Caucasian females that received time

3     off also.

4  Q. Okay. So you feel like you were denied

5     time off on these three occasions

6     because --

7  A. Race and gender.

8  Q. -- you're female; is that correct?

9  A. My race and gender, yes, sir.

10 Q. Because of your race and your gender?

11 A. Yes, sir.

12 Q. And that's because you feel like

13    Mr. Bronson received time off when he

14    asked for it; correct?

15 A. Yes, sir.

16 Q. Now tell me about this white female.

17    Who is this?

18 A. Miss Heather.

19 Q. Miss Heather?

20 A. Yes, sir.

21 Q. What's Miss Heather -- do you have her

22    full name?

23 A. No.

Exhibit A

## FREEDOM COURT REPORTING

Page 141

1   Q. So there's a -- is she employed with

2       ECDC?

3   A. Yes, sir.

4   Q. Was she -- what was her position?

5   A. She was a teacher.

6   Q. She was a teacher and she's a white

7       female?

8   A. Yes, sir.

9   Q. And she received time off at some

10      point?

11  A. She didn't show up for work.

12  Q. Who didn't?

13  A. Miss Heather.

14  Q. She didn't show up for work?

15  A. Yes, sir.  And nothing happened to her.

16  Q. When?

17  A. I don't remember the year.

18  Q. You don't remember which year it was

19      in?

20  A. No, sir.

21  Q. But there was some -- a point in time

22      when --

23  A. Yes, sir.

Exhibit A

## FREEDOM COURT REPORTING

Page 142

1  Q. -- this teacher named Miss Heather

2     missed work?

3  A. Yes, sir.

4  Q. And was not punished?

5  A. Yes, sir.

6  Q. And that's your perception?

7  A. Yes, sir.

8  Q. Do you have any documents to back that

9     up?

10 A. No, sir.

11 Q. I mean, do you know if she was

12    punished?

13 A. Do I know if she was punished?

14 Q. Yeah.  How do you know she wasn't

15    punished?

16 A. Because she came back to work the next

17    day.

18 Q. Well, there's other kinds of

19    punishment, though; right?

20 A. Sir?

21 Q. There's other kinds of punishment

22    besides firing her; right?

23 A. Yes, sir.

Exhibit A

## FREEDOM COURT REPORTING

Page 143

1    Q. So, I mean, she could have very easily

2       been punished and you just didn't know

3       about it; right?

4    A. Yes, sir.

5    Q. Okay.  Same thing with Mr. Bronson, he

6       could have been punished and you just

7       didn't know about it; right?

8    A. Yes, sir.

9    Q. All right.  Now, what other claims --

10      what other claims are you bringing?

11   A. I need to ask him.  I'm trying to ask,

12      what do you mean?

13            MR. HURST:  He's just asking

14      about the incidents.  If these are all

15      you're bringing that you know of, then

16      that's fine.

17   Q. Right.  I just need to know -- again,

18      this is your lawsuit, your claim that

19      you've been discriminated against, and

20      I need to know the instances.  So far

21      all I've got is three instances that

22      other people -- that you feel like you

23      should have gotten some time off on

Exhibit A

## FREEDOM COURT REPORTING

Page 144

1    three instances because other people

2    got time off at other times.  I need to

3    know what else you're bringing the

4    lawsuit on.  What are your other

5    complaints?

6  A. I'm still not understanding.

7         MR. HURST:  Like the maternity

8    leave.  He's asking whatever you're

9    bringing, complaining about.  If you

10   can't think of any more, just say, I

11   can't think of any more.

12 A. Can't think of any more.

13 Q. Okay.  Are you still maintaining in

14   this lawsuit the claims that you made

15   in your EEOC complaint?

16 A. What are you --

17 Q. Are all the claims that you submitted

18   to the EEOC -- do you remember doing

19   that?

20 A. Yes, sir.

21 Q. Are you still maintaining those claims

22   now or are you releasing those claims?

23        MR. HURST:  You're releasing

Exhibit A

## FREEDOM COURT REPORTING

Page 145

1   them.

2   A. Releasing them.

3           MR. GARRETT:  So you're

4   releasing the claims in the --

5           MR. HURST:  Yeah.  I had

6   nothing to do with that.

7   Q. So for the record, you're no longer

8   bringing the claims that you did in

9   your EEOC complaint; correct?

10  A. Correct.

11  Q. Now, in your Complaint you've got

12  several causes of action.  This is the

13  original Complaint, not your Amended

14  Complaint.  The original Complaint, I

15  need to ask you about these, too, to

16  see if you're still bringing them.

17       There's a claim here in September

18  2003, payroll checks being opened and

19  read by plaintiff's supervisor.  Are

20  you still bringing that claim with

21  regard to racial or gender

22  discrimination?

23  A. Yes.

Exhibit A

## FREEDOM COURT REPORTING

Page 154

1  Q. So any claims about the safety of

2     children are being waived?

3  A. Yes, sir.

4  Q. Okay.  Same thing, September of 2003,

5     plaintiff expresses her concern of

6     several objectives regarding her right

7     to maternity leave.

8  A. Yes.

9          MR. HURST:  We're bringing

10    that.

11 A. Bringing that.

12 Q. You're bringing that one?

13 A. Yes.

14 Q. Okay.  Tell me about that one.  What

15    are you talking about there?

16         (No immediate response given.)

17         MR. HURST:  Tell him about

18    what's going on.

19 Q. You've got to tell me.

20         MR. HURST:  Was there white

21    females that got time off?  Just tell

22    him the story.

23         THE WITNESS:  Oh, yes, sir.

Exhibit A

## FREEDOM COURT REPORTING

Page 155

1  A. There was -- there was a white female

2     who received time off for maternity

3     leave.

4  Q. First thing, who are we talking about?

5     Who's the white female?

6  A. Ms. Honey Williams.

7  Q. Honey Williams?

8  A. Yes.

9  Q. And when was this?  When are you

10    talking about?  What time?

11  A. The year, month ?

12  Q. I got to know.  You've got to tell me

13    what you're talking about.

14  A. The year she was pregnant or I was

15    pregnant?

16        MR. HURST:  When she was

17    pregnant.

18  A. Okay.  When she was pregnant.  '03.

19  Q. When in '03?

20  A. Ms. Honey Williams?

21  Q. I mean, I need to know what you're

22    talking about.  I need to know what

23    you're suing me for.

Exhibit A

## FREEDOM COURT REPORTING

Page 156

1    A.  I can just the year.  The month --

2    Q.  There is -- okay.  There's a white

3        female at ECDC named Honey Williams.

4        She was pregnant in 2003.  Is that what

5        you're telling me?

6    A.  Yes, sir.

7    Q.  So what are you angry about with her?

8    A.  She received her time off for pregnancy

9        leave.

10   Q.  How much did she receive off?

11   A.  She had eight weeks.

12   Q.  She got eight weeks off of work for

13       pregnancy?

14   A.  Yes, sir.

15   Q.  How do you know that?

16   A.  She said she was -- she was -- she was

17       taking her maternity leave.  She told

18       us when she left.

19   Q.  So she told you, I'm going to be gone

20       for eight weeks on maternity leave?

21   A.  Yes.

22   Q.  Okay.  Is Honey Williams a white lady?

23   A.  Yes.

Exhibit A

# FREEDOM COURT REPORTING

Page 157

1  Q. All right.  So she took eight weeks

2     off.  All right.  So what's that got to

3     do with you?

4  A. During my maternity leave, I requested

5     the time to take.

6  Q. So you requested eight weeks off?

7  A. The -- not on paper, you know, not on

8     the -- but I went to her to ask her

9     about my maternity leave, would I be

10    able to be off.  But during my --

11 Q. Hold on.  Let's just start -- did you

12    request time off for maternity leave,

13    first things first?

14 A. Yes, I asked about maternity leave.

15 Q. Okay.  And were you given eight weeks

16    off for maternity leave?

17 A. Was I --

18 Q. Yeah.  Were you given eight weeks off?

19 A. No, sir, not by them.  By the doctor.

20    It was, like, health risk.

21 Q. What was like health risk?

22 A. My maternity.  My maternity was.  The

23    doctor took me off my feet.

Exhibit A

## FREEDOM COURT REPORTING

Page 158

1  Q. All right.  When did he do that?

2  A. In December of '03.

3  Q. So the doctor told you in December of

4     '03 that you need to be off your feet?

5  A. Yes, sir, during my maternity leave.

6  Q. Okay.  So what happened?

7  A. During my evaluation, she -- Ms. D had

8     written that I would not be returning

9     back to work after my maternity leave.

10 Q. Ms. D had written --

11 A. Yes.

12 Q. I'm confused.  Did you request time off

13    for maternity leave?

14 A. Did I request time off?

15 Q. Yeah.  Did you request time off for

16    maternity leave?

17 A. I asked about time off for maternity

18    leave.

19 Q. So that's a yes?

20 A. But -- yes.

21 Q. Who did you ask?

22 A. Ms. Darlene Maye.

23 Q. And when was that?

Exhibit A

# FREEDOM COURT REPORTING

1  A. In '03.

2  Q. When in '03?

3  A. December.  I would say December,

4     because the doctor took me off.

5  Q. So December of '03, doctor said you

6     need to be off your feet.  You went to

7     Ms. Maye and requested time off; is

8     that correct so far?

9  A. The doctor took me off of my feet after

10    I requested the time off from

11    Ms. Darlene Maye, because she was . . .

12 Q. Okay.  What did -- when you requested

13    time off, what did Ms. Maye say to you?

14 A. I -- I had to have a doctor excuse --

15 Q. Okay.

16 A. -- for the time off.

17 Q. Okay.  Did you get one?

18 A. Yes, sir.

19 Q. Okay.  Did you bring it back in?

20 A. Yes, sir.

21 Q. Okay.  So did she deny your time off?

22 A. No, sir.

23 Q. Okay.  So what's the problem?  What's

Exhibit A

# FREEDOM COURT REPORTING

Page 160

1  your complaint?

2         (No immediate response given.)

3  Q. So far the doctor said you had to be

4  off your feet because you -- on

5  maternity leave.

6  A. Right.

7  Q. She said okay.  I need to see a

8  doctor's notice -- I mean a doctor's

9  letter saying that.  You brought her

10  the doctor's letter.  She let you off

11  work.  Right?

12  A. Right.  This was before the doctor had

13  gave me that excuse I had asked her for

14  time off.

15  Q. Okay.

16  A. And she denied me the time off unless I

17  had a doctor's excuse.

18  Q. Okay.  Is there anything wrong with

19  that?

20  A. The Family Leave Act gave me the time

21  off for my -- on maternity leave.

22  Q. Yeah.

23  A. But she was denying me that.  But she

Exhibit A

## FREEDOM COURT REPORTING

Page 161

1     allowed Miss Honey to take hers.

2   Q. You weren't denied it.  You went on

3     maternity leave.

4   A. I was denied until the doctor said I

5     had to go on maternity leave.

6   Q. And you're saying that you shouldn't

7     have had to bring in a doctor's note is

8     what you're saying?

9   A. Yes, sir.

10  Q. And you feel there's some law on that?

11  A. I don't know the law on that.

12  Q. So your claim is that you were

13     discriminated against by Ms. Maye

14     because she required that you show a

15     doctor's notice before allowing you off

16     for maternity leave?

17  A. Yes, sir.  And she didn't require

18     Miss Honey a doctor note.

19  Q. How do you know that?

20  A. Miss Honey said she asked for her time

21     off.

22  Q. Yeah, but --

23  A. She told us.

Exhibit A

## FREEDOM COURT REPORTING

Page 162

1   Q. -- did Miss Honey tell you that she

2       didn't bring a doctor's note or that

3       she did?

4   A. No, she didn't.

5   Q. So you don't know one way or the other?

6   A. No, sir.

7   Q. Correct?

8   A. Correct.

9   Q. Okay.  I mean, any other complaints

10      regarding your maternity leave?

11  A. No, sir.

12  Q. I mean, no complaints about the --

13      that's your only complaint, that you

14      had to bring a doctor's note to get

15      your time off?

16  A. Other complaints, what do you . . .

17  Q. Well, I mean, I just want to make sure

18      I've got it.  With regard to the way

19      that you were treated for maternity

20      leave, is it your only complaint that

21      you were discriminated against because

22      you had to get a doctor's note to

23      initiate that time off?  Is that your

Exhibit A

# FREEDOM COURT REPORTING

Page 163

1    only complaint?

2    A. Yes, sir.

3    Q. Okay.  You don't have any complaints

4       about the amount of time you were off,

5       no complaints about pay?  I mean,

6       that's your only complaint?

7    A. Yes, sir.

8    Q. Okay.  What -- all right.  In February

9       2005, plaintiff was refused time off

10      and threatened for continuing required

11      professional development and

12      advancement classes.  Tell me about

13      that.

14   A. Those are the twelve hours that were

15      required that you have to stay in the

16      center you have to work on every year.

17   Q. Right.  So what's your complaint here?

18      In February 2005, plaintiff was refused

19      time off and threatened for continuing

20      required professional development

21      advancement classes.  What are you

22      talking about there?

23   A. The threatening part was that --

Exhibit A

## FREEDOM COURT REPORTING

Page 164

1   Q. First, what are you --

2              MR. HURST:  Was it related to

3      race or discrimination -- race or

4      gender?  If it's not --

5              THE WITNESS:  Yes.

6              MR. HURST:  That's related to

7      race?

8   Q. Or gender?

9   A. Read -- read it.

10  Q. It --

11             MR. HURST:  It's a threat about

12     your twelve hours.

13  A. Oh, yes.  Oh, yes.

14  Q. So that's --

15  A. Yes.

16  Q. Well, tell me about what you're talking

17     about.  I mean, it says you were

18     refused time off.

19  A. Right.

20  Q. And threatened for continuing

21     development classes.  Tell me about it.

22     What happened?

23  A. The refused time off was back with the

Exhibit A

# FREEDOM COURT REPORTING

Page 165

1    baby and threatened when -- that was

2    back with that.

3  Q. This says February of '05, now.  That's

4    not -- that's well after your

5    maternity.

6  A. Right.  This was back when the baby was

7    going to the doctor.

8  Q. I see.  Those are two different --

9    okay.  What's the threatening for

10   continued required professional

11   development classes?  What are you

12   talking about there?

13 A. The twelve hours.

14 Q. What about the twelve hours?  What do

15   you mean?

16 A. I was working on my twelve hours.  I

17   was working and I was going --

18 Q. First of all, when?  When were you

19   working?  What dates or times?  When

20   were you doing this?

21 A. During that year.  And you have to do

22   it during --

23 Q. What year?

Exhibit A

## FREEDOM COURT REPORTING

1  A.  Of '05.

2  Q.  Okay.  So in 2005, you were working --

3  A.  On my credit hours.

4  Q.  -- on your credit hours.  All right.

5  A.  And while I was working on my credit

6      hours -- and I gave her proof that I

7      was working on my credit hours -- she

8      told me that if I didn't get my credit

9      hours by the end of February, I was

10      going to be terminated.

11  Q.  Okay.

12  A.  Now, we had Mr. Lamar, he was still

13      working on his.  He was not threatened

14      to be terminated.  We had Miss Heather

15      still working on hers.  She was not

16      threatened to be terminated.

17  Q.  How do you know that?

18  A.  How do I know they was working on their

19      hours?

20  Q.  How do you know they weren't threatened

21      to be terminated?

22  A.  Because they were still being able to

23      go take theirs after the time she said

Exhibit A

## FREEDOM COURT REPORTING

1    that I had to receive mine.

2  Q. Well, first of all, what -- you said

3    you were working -- when did she tell

4    you that you had to have your hours in

5    by February of '05?  When did she tell

6    you that?

7  A. Before I was terminated.

8  Q. I know.  But, I mean, when -- what day?

9    When did she tell you this?  You said,

10    She told me I had to have my time in by

11    February of 2005, when did she tell

12    you?

13  A. I don't know the date.  I knew it was

14    during '05.

15  Q. So at some time in 2005, Ms. Maye told

16    you -- February.  It's only two months

17    into '05.  So you're talking about --

18  A. You said date.  I don't . . .

19  Q. I mean, again, it's your complaint.

20    I'm just trying to figure out what it

21    is that you think we've done wrong.

22    Okay?  You said, Sometime in 2005, she

23    told you that you had to have your

Exhibit A

## FREEDOM COURT REPORTING

Page 168

1  hours in by February.  All right?

2  That's only two months in the year.  So

3  what I'm saying is, did she tell you

4  this in '04?  Did she tell you in '05?

5  A.  In '05.

6  Q.  In January, early February?

7  A.  No.  Like a week before termination.

8  It was a week before she terminated me.

9  Q.  When were you terminated?

10  A.  March of '05.

11  Q.  All right.  So you were terminated in

12  March of '05.  She told you at some

13  point that you had to have your hours

14  in by February of '05; right?

15  A.  Right.

16  Q.  This is before March -- January,

17  February, March.

18  A.  Yeah.  This is at the end.  It was at

19  the end of February.  It was a week

20  before I was terminated.

21  Q.  Well, that would be end of March.

22  A.  A week before.

23  Q.  A week before when?

Exhibit A

## FREEDOM COURT REPORTING

Page 169

1   A. In February, that week, the last week

2      of February.

3   Q. Right.  You were terminated in early

4      March?

5   A. Yes.

6   Q. And it's your claim that in the latter

7      part of February she told you you had

8      to have your hours in by February?

9   A. Yes.  I needed four more hours.

10  Q. Okay.  And did you know about this

11     termination date in February?

12  A. No, sir.

13  Q. Okay.  Do you -- are you responsible

14     for keeping up with your hours every

15     year?

16  A. Yes, sir.

17  Q. And is the ECDC program or First United

18     Methodist or Ms. Maye responsible for

19     you doing your hours?

20  A. No, sir.

21  Q. And you knew they were coming due in

22     February; right?

23  A. They're due a year.

Exhibit A

**FREEDOM COURT REPORTING**

Page 170

1   Q. Right.

2   A. Right.

3   Q. So you knew the February date before

4      she told you about it; right?

5   A. Right.  But I had proof that I was

6      going to this date.  I had my receipt

7      saying that I would receive these last

8      four hours.  And she turned that

9      receipt down and said she didn't want

10     to see that.  She wanted to see the

11     certificate, which wasn't going to be

12     held until March.  The class was not

13     until March.

14  Q. Right.  But it's your responsibility to

15     get your hours in; right?

16  A. Yes, sir.  And I got them in.

17  Q. You got them in?

18  A. Yes, sir.

19  Q. When did you get the last four hours?

20  A. In March.

21  Q. So that's after the deadline?

22  A. Not with DHR.  As long as you have a

23     receipt from DHR saying you've taken

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Exhibit A

## FREEDOM COURT REPORTING

Page 171

1    your hours and that class is coming up,

2    then they would waive that.

3  Q. They would waive that?

4  A. Yes.  They will come back and check

5    again, your records, to make sure that

6    I took that hour.

7  Q. Okay.  So it's your testimony you

8    believe that DHR will allow you to not

9    fulfill your certificate hours within

10   the deadline time if you have some kind

11   of proof --

12 A. Yes, sir.

13 Q. -- that you are signed up to take

14   enough hours after the deadline has

15   passed to be certified?

16 A. Yes, sir.

17 Q. Okay.  Now, it's your testimony that --

18   did you show that to Ms. Maye --

19 A. Yes, sir.

20 Q. -- the receipt?

21 A. I did.

22 Q. And what did she tell you?

23 A. She didn't want to see that.  She

Exhibit A

## FREEDOM COURT REPORTING

Page 172

1      wanted to see the certificate.

2 Q. What did you say?

3 A. I said that I couldn't receive the

4      certificate until March.  I had the

5      receipt that I can show her that I was

6      taking this class.

7 Q. Why were you limited to just this one

8      class in March?

9 A. I had already took all the other ones.

10 Q. So there was no other available hours

11      anywhere for you to get?

12 A. I had took all my other hours.

13 Q. I understand.  But I'm saying, were

14      there other ways for you to get hours

15      aside from this one March session you'd

16      signed up for?

17          (No immediate response given.)

18 Q. In other words, instead of waiting

19      until March, you could have gone

20      somewhere else and got them; right?

21 A. Not at that time, no.

22 Q. You couldn't?

23 A. Uh-uh.  (Witness shakes head.)

Exhibit A